### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALAN M. BLASSBERG, | : | CASE NO. 3:24-cv-02034-MPS |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| LHAKPA SHERPA, NETFLIX, INC., | : | |
| SK GLOBAL ENTERTAINMENT, INC., | : | |
| AVOCADO & COCONUTS | : | |
| PRODUCTIONS, LLC, | : | |
| MAKEMAKE, LLC, and | : | |
| OBB MEDIA, LLC, | : | |
| *Defendants* | : | SEPTEMBER 29, 2025 |

### SECOND AMENDED COMPLAINT

Pursuant to the Court's Order of September 12, 2025, (Doc.71), the Plaintiff, Alan Blassberg, hereby submits this Second Amended Complaint.

### PARTIES

1.      The Plaintiff, Alan M. Blassberg, is an individual and resident of the State of California. The Plaintiff is an award-winning television and film producer and educator with over 25 years of film industry experience, and at all times mentioned herein was doing business as First Prize Productions and/or Alan Blassberg.

2.      The Defendant, Lhakpa Sherpa, is an individual and resident of the State of Connecticut. The Defendant is an internationally recognized mountain climber.

3.      The Defendant, Avocado & Coconuts Productions, LLC (**"ACP"**), is a Delaware limited liability company with a principal place of business at 345 Maple Drive, Suite 350, Beverly Hills, California.

4.      The Defendant SK Global Entertainment, Inc. (**"SKG"**), is a Delaware corporation registered to do business in the state of Connecticut, with a principal place of business at 345 North Maple Drive, Suite 350, Beverly Hills, California.

1

5.    The Defendant, OBB Media, LLC, (**"OBB"**) is a Delaware limited liability company with a principal place of business at 155 N. La Peer Drive, West Hollywood, California.

6.    The Defendant MakeMake, LLC, is a California limited liability company with a principal place of business at 2308 Broadway, Santa Monica, California.

7.    The Defendant, Netflix, Inc., is a Delaware corporation registered to do business in the state of Connecticut, with a principal place of business at 5808 W. Sunset Blvd., 11th Floor, Los Angeles, California.

**JURISDICTION AND VENUE**

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) in that this case arises, in part, under the laws of the United States pertaining to copyright.

9.    This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 in that said claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), and/or (b)(3), 28 U.S.C. § 1391(c)(1) and (c)(2), and 28 U.S.C. § 1400.

**FACTS**

**Contract Overview.**

11.    On August 28, 2014, the Plaintiff and the Defendant Sherpa entered into a contract whereby they agreed to develop and produce an original television, film, literary/digital media concept concerning the Defendant's life and achievements as a mountain climber (the **"Concept"**) with a working title of *Whiteface Mountain* (**"Contract One"**). Contract One provided, inter alia, that:

2

a. The term of the contract was for an eighteen-month period beginning August 28, 2014, (the **"Term"**).

b. The parties would work together to develop and market the Concept for sale, option and/or other disposition (**"Disposition"**) to a network, distributor, and/or third-party production company or financier (**"Licensee"**);

c. Contract One would be for a period of eighteen (18) months from August 28, 2014, with the term of Contract One to be extended if Plaintiff was in significant good faith negotiations with a third-party distributor through the conclusion of any such negotiations;

d. During the term of Contract One, neither party would negotiate or enter into any contract for a television, film, literary/digital media project substantially similar to the Concept, other than with the Plaintiff or party designated by the Plaintiff;

e. Subject only to Licensee approval, the Plaintiff would serve in a producer capacity for the Concept, with a fee to be negotiated in good faith in accordance with the budget for each episode in accordance with industry standards.

f. Any agreement with a Distributor (**"Development/Production Agreement"**) would be subject to the approval of the Plaintiff, and the terms of Contract One would be extended for the duration of any Development/Production Agreement, and would be deemed approved by both parties should the Development/Production Agreement incorporate certain terms.

g. For a period of twelve months following expiration of the Term, the parties agreed they would not enter into an agreement with respect to the development and/or production of any project similar in nature to the Concept unless the Plaintiff was also attached as Executive Producer on any such project.

3

12.     On August 13, 2016, the Plaintiff and Defendant Sherpa entered into an agreement whereby they agreed to extend the Term of Contract One through August 28, 2017, with all of the other terms and conditions of Contract One to remain in full force and effect (**"Contract Two"**).

13.     On December 23, 2017, the Plaintiff and Defendant Sherpa entered into an agreement whereby they agreed to extend the Term of Contract One, as amended by Contract Two, through December 23, 2018, with all of the other terms and conditions of Contract One to remain in full force and effect (**"Contract Three"**, and collectively with Contract One and Contract Two, the **"Contract"**). Contract Three was also amended to include a "life rights" or "life story" agreement whereby Sherpa granted Plaintiff permission to use her personal details and characteristics, including her image, name, likeness, and experiences in connection with the Concept. Copies of the Contract are attached hereto as **Exhibit A**.

**Film Outline Overview.**

14.     Plaintiff developed the Concept over the course of time and authored an outline of his creative vision for the Concept that became known as the *Goddess of the Sky* (Alternate Titles: *Whiteface Mountain* and *The Snow Leopard*) "text" (the **"Copyrighted Material"** or **"Outline"**), which he completed in early 2017.

15.     In April 2017, Plaintiff traveled to Nepal with members of his production team, including Mike Reinwald and Ana Saldana, to meet with Defendant Sherpa for a pre-production meeting. They met at the place of business of Defendant Sherpa's brother, Migma Sherpa. An additional member of the production team, Ram Raja Dahal was also present. At this meeting, Reinwald made copies of the Outline, which were handed to Sherpa and her brother.

16.     On information and belief, on or before December 23, 2018, while the Contract was in force and effect, Defendant Sherpa entered into a business relationship with Defendant ACP, its agents, servants, and./or employees.[1]

17.     On November 19, 2019, Dalia Burde, founder and CEO of Defendant ACP, with the username "littleburde" posted on her Instagram social media account, that "[f]or the past year, [ACP] has been working on a very special and important film project about [Defendant] Lhakpa Sherpa…" (the **"ACP Project"**). On the same date, Defendant ACP, with the username "avocadoandcoconuts" posted identical content on its Instagram social media account.

18.     In 2021, ACP, its agents, servants, and/or employees engaged and/or introduced the producer and director Lucy Walker to the ACP Project.

19.     On or before 2022, the Defendant OBB became engaged in the production of the ACP Project.

20.     On or about November 3, 2021, ACP and Defendant Sherpa entered into a formal "life story" agreement with Sherpa in connection with the ACP Project. On June 22, 2022, ACP caused to be registered with the U.S. Copyright Office "Life story: Lhakpa Sherpa; documentary" noted as "Agreement," effective November 3, 2021.

21.     The Plaintiff first learned of Defendant Sherpa's involvement with third parties in the development and/or production of a project similar in nature to the Concept in early January 2022, when he was alerted to the social media postings of ACP as referenced in Paragraph 16, above.  Prior to that, he had no reason to believe that the Defendant Sherpa had engaged in such activity during their contract period.

---

[1] *See* Avocados and Coconuts website, archived at:
https://web.archive.org/web/20240913224142/https://www.avoca,dosandcoconuts.com/team

22.     On January 27, 2022, the Plaintiff, through counsel, contacted ACP to express concerns about the ACP Project and that Defendant Sherpa was in breach of the Contract.

23.     On March 3, 2022, Dalia Burde, the owner and CEO of ACP, responded that "While I appreciate Mr. Blassberg's concerns, it has been represented to me that there are no third-party obligations of Lhakpa's that have any bearing on my company's work with her." Dalia Burde also provided Plaintiff's counsel with Sherpa's Pro Bono Counsel's contact information.

24.     In an apparent reaction to Plaintiff's communications with ACP, and unbeknownst to the Plaintiff at that time, ACP took the following steps, along with defendants Sherpa and SKG, concerning the ACP Project:

a.  On or about March 21, 2022, and again on May 20, 2022 and May 21, 2022, ACP along with Bacon Road, LLC and Kimmel Distribution, LLC, executed a document subsequently noted as "Security agreement and mortgage of copyright. Section 12 of the DCS not complete. DCS recorded with errors, with approval by management due to backlog," which was recorded with the US Copyright Office on June 22, 2022. Defendant SKG is the Manager and/or a member of Kimmel Distribution, LLC.

b.  On or about April 6, 2022, ACP and Defendant Sherpa entered into an amended life story agreement effective as of April 6, 2022, and recorded same as "Life story, Lhakpa Sherpa" noted as "Amended and restated life story rights agreement," effective April 6, 2022, which was recorded with the US Copyright Office on June 22, 2022.

c.  On or about April 6, 2022, and May 15, 2022, ACP and Kimmel Distribution, LLC, executed a document noted as "Assignment and assumption agreement.

DCS recorded with errors, with approval by management due to backlog," which was recorded with the US Copyright Office on June 22, 2022.

25.    On or about March 31, 2022, Plaintiff's counsel spoke at length with Defendant Sherpa's counsel, Attorney Benjamin Korray, concerning Sherpa's involvement in the ACP Project and the breach of her contract with Plaintiff. Attorney Korray denied any breach of the contract and otherwise stated there were no conflicts or issues concerning Plaintiff's concept and the ACP Project.

26.    Following publication of an article concerning Defendant Sherpa appearing in the *New York Times* on or about February 14, 2023, Plaintiff's counsel again reached out to Attorney Korray to discuss concerns over the ACP Project. Attorney Korray responded that he no longer represented Defendant Sherpa and did not represent ACP.

27.    Thereafter and continuing through April 2023, the Plaintiff, through counsel, provided additional notice to Defendant ACP of the Plaintiff's concerns over the ACP Project and Defendant Sherpa's breach of Contract. ACP continued to ignore and/or dismiss the Plaintiff's concerns and ultimately refused to discuss it.

28.    On or about September 12, 2023, Christopher Newman, an agent, servant and/or employee of Defendant ACP, with the user name "newmanfilm" posted on his Instagram social media account that Defendant Netflix had "picked up" the ACP Project, now titled *Mountain Queen: The Summits of Lhakpa Sherpa* ("**Mountain Queen**")  and that since 2018 ACP had been working with, inter alia, Defendant Sherpa,  Defendant SKG, and Defendant OBB "to capture the remarkable life" of Defendant Sherpa.

29.    On information and belief, *Mountain Queen* had its first publication at its "world premiere" at the Toronto International Film Festival on September 8, 2023.

30.    Beginning on December 21, 2023, and continuing through July 1, 2024, Plaintiff, through counsel, communicated with Defendants ACP, SKG, OBB and Netflix

addressing Plaintiff's concerns over the Sherpa Contract, and putting them on notice of apparent issues concerning a tainted chain of title, or the ownership rights of the *Mountain Queen*, demanding that they cease and desist from displaying the film as it violated the Plaintiff's rights.

31.    On July 31, 2024, Defendant Netflix released *Mountain Queen* on its video streaming service.

32.    Since its release, *Mountain Queen* has been nominated for and/or received numerous awards including second runner-up for the People's Choice Award for Documentaries at the Toronto International Film Festival, the Grand Prize at the 2024 Kendal Mountain Festival's International Film Competition, a 2024 Peabody Award, the 2025 Sports Emmy Award for Best Long Documentary, and nominations for an Academy Award and Producers' Guild Award.

33.    The Statutes of Limitation for the bringing of this action were tolled for three-hundred forty-seven (347) days for the period commencing March 19, 2020, through February 8, 2021, pursuant to Executive Orders 7G and 10A issued by Connecticut Governor Ned Lamont.

**FIRST COUNT – BREACH OF CONTRACT**

**(Against Defendant Sherpa)**

34.    Paragraphs 1 through 33 set forth above are hereby incorporated by reference as if fully set forth herein.

35.    The Plaintiff invested considerable amounts of time and money in the performance of all conditions, covenants, promises, and obligations in accordance with the terms of the Contract.

36.    The Defendant Sherpa materially breached the terms of the Contract when she entered into an agreement and/or took one or more steps and actions with one or more of the

Defendants ACP, SKG, OBB, MakeMake, and/or Netflix to develop, produce, and/or publish *Mountain Queen.*

37. The Defendant Sherpa materially breached the terms of the Contract when she entered into an agreement and/or took one or more steps and actions with one or more of the Defendants ACP, SKG, OBB, MakeMake, and/or Netflix to develop, produce, and/or publish *Mountain Queen* without the Plaintiff being attached as an Executive Producer.

38. As a result of the Defendant Sherpa's breach of the Contract, the Plaintiff has suffered substantial and irreparable damages and losses including but not limited to: (1) loss of Executive Producer and/or Producer credit and associated compensation valued at industry standard rates for award-winning documentaries, (2) loss of exclusive production rights to the Concept, (3) significant and permanent injury to his professional reputation in the entertainment industry, (4) loss of specific business opportunities with Chinese distributors and other parties, and (5) loss of monetary compensation he would have received in accordance with the terms of the Contract and commensurate with film industry standards for award-winning documentary productions.

## SECOND COUNT – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant Sherpa)

39. Paragraphs 1 through 33 set forth above are hereby incorporated by reference as if fully set forth herein.

40. The Contract carries with it a covenant of good faith and fair dealing, giving rise to a duty that Defendant Sherpa not do anything to injure the Plaintiff's right to recover the benefit he was entitled to under the terms of the Contract.

41. The Defendant Sherpa's actions as described herein are in breach of the covenant of good faith and fair dealing with the Plaintiff.

42.     As a result of the Defendant Sherpa's breach of the covenant of good faith and fair dealing the Plaintiff has suffered damages and losses including but not limited to losing credit for the development and production of the Concept, loss of production rights to the Concept, injury to his professional reputation, loss of business opportunities and the monetary compensation he would have received in accordance with the terms of the Contract and commensurate with film industry standards.

**THIRD COUNT – UNJUST ENRICHMENT**

**(Against Defendant Sherpa, In the Alternative to Counts One and Two)**

43.     Paragraphs 1 through 33 set forth above are hereby incorporated by reference as if fully set forth herein.

44.     To the extent that a valid and enforceable contract is not found to govern the subject matter of Plaintiff's contributions, Plaintiff pleads the following in the alternative.

45.     The Defendant Sherpa received financial and economic benefit from the time, effort, and creative work product expended and created by the Plaintiff to develop and/or produce the Concept.

46.     The Defendant Sherpa unjustly failed to pay the Plaintiff for the benefits she received by virtue of the Plaintiff's actions, and has therefore been unjustly enriched thereby.

47.     As a result of the Defendant Sherpa's unjust enrichment, the Plaintiff has sustained monetary damages.

48.     It would be inequitable for the Defendant Sherpa to retain the benefits of her unjust enrichment, and any such benefit should be paid over to the Plaintiff.

**FOURTH COUNT – DIRECT COPYRIGHT INFRINGEMENT**

**(Against All Defendants)**

49.     Paragraphs 1 through 33, set forth above, are hereby incorporated by reference as if fully set forth herein.

50.     Plaintiff is the owner and author of the *Goddess of the Sky* (Alternate Titles: *Whiteface Mountain* and *The Snow Leopard*) "text" (the **"Copyrighted Material"** or **"Outline"**), created and completed in early 2017, and duly registered with the United States Copyright Office on July 27, 2024 (Reg. No. PAu 4-233-632) prior to the release of *Mountain Queen* on July 31, 2024.

51.     The Copyrighted Material consists of the Plaintiff's original, creative, and proprietary selection, arrangement, coordination, and synthesis of the historical facts of Defendant Lhakpa Sherpa's life, which the Plaintiff transformed into a unique, three-act cinematic narrative structure while under exclusive Contract, incorporating specific creative elements, character development, and dramatic sequences that transcend mere biographical facts and represent protectable original expression designed for international film distribution, including in the Chinese market. The specific narrative blueprint of the Copyrighted Material, including its particular pacing, thematic focus, character arcs, and especially its original concluding act, constitutes the protectable creative expression at issue in this claim.

52.     Key to the creation of Plaintiff's Copyrighted Material was the Plaintiff's act of selecting disparate facts, omitting others, and arranging them for the first time into a cohesive, three-act cinematic narrative with a specific beginning, rising action, climax, and resolution—a narrative structure that did not exist anywhere in the public domain.

53.     Plaintiff's unique presentation was created under contract to underscore the market-ready nature of Plaintiff's Copyrighted Material. Plaintiff was approached by a Chinese distributor, who expressly requested a detailed, act-by-act outline for of the Copyrighted Material to address specific concerns required for Chinese distribution, which Plaintiff prepared as set forth in the Outline, presenting a fully realized narrative design intended for production and international distribution, to be considered and understood by

11

film industry participants as a completed, distributable narrative blueprint suitable for acquisition and exploitation.

54.     Given the uniqueness, originality, and complexity of the scenes, themes, specific locations, and narrative structure set forth in the Outline, the substantial and specific similarities of the Outline to *Mountain Queen*, identified below, constitute "striking similarities" and "substantial similarities" within the meaning of the law.

55.     Defendants, without authorization, license, or consent, copied, reproduced, publicly performed, displayed, and/or distributed substantial and protectable elements of expression from Plaintiff's Copyrighted Material by creating and distributing *Mountain Queen*, a film incorporating original and significant elements of the Copyrighted Material.

56.     Defendants, their agents, servants and/or employees, viewed, were made aware of, and otherwise had access to the Copyrighted Material prior to and during the creation of Mountain Queen, which was publicly released on Defendant Netflix's streaming service on July 31, 2024.

57.     A direct chain of access exists from Plaintiff to the other Defendants through Defendant Sherpa. In April 2017, Plaintiff provided a copy of the Outline to Defendant Sherpa, while she was under contract with Plaintiff. Upon information and belief, shortly thereafter, Defendant Sherpa began working directly with ACP, its agents, servants, and employees, including but not limited to Christopher Newman and/or Dalia Burde, to develop the film that would become *Mountain Queen*. Given this collaborative relationship and the fact that the Copyrighted Material provided a comprehensive, ready-made narrative blueprint for the film, it is a reasonable and plausible inference that Defendant Sherpa provided the Copyrighted Material to ACP and its agents to guide the development of the *Mountain Queen*.

58.    On December 6, 2019, and January 10, 2020, ACP posted on its "lhakpafilm" and its "avocadoandcoconuts" Instagram social media accounts, respectively, that in 2019, ACP accompanied Defendant Sherpa and her daughters to Sherpa's mother's remote village in Nepal, where their grandmother met Sherpa's daughters for the first time. While film of this event does not appear in *Mountain Queen*, this scene mirrors an identical, original, and unique scene, which appears in Plaintiff's Outline, evidencing ACP's access to the Outline when creating *Mountain Queen*.

59.    On or before March 2021, ACP began working with SKG and/or its affiliate Kimmel Distribution, LLC.

60.    Subsequently, ACP, in its effort to secure financing and production partners, entered into a close working relationship with Defendants SKG, OBB, and MakeMake. It is a reasonable inference that ACP provided the Copyrighted Material to these financial backers to demonstrate the creative vision and commercial viability of the project, as evidenced by the striking similarities between the Copyrighted Material and the final film. In fact, Director Lucy Walker stated in multiple interviews that she had to "convince" the financial backers of the film (SKG and OBB) to shoot the film on Mount Everest.

61.    This inference is supported by public statements from the film's executive producer and director, Lucy Walker the of "Mountain Queen," who stated, in a 2024 interview with Filmmaker Magazine, that the financial backers of the film had control over the film to the extent that they did not want to shoot it in Nepal, but she had to convince them otherwise, indicating that the financial backers exercised creative control over the film's production. The striking similarity between the final film and the Copyrighted Material makes it highly probable that the Outline was not merely possessed by one Defendant, but was actively used as a foundational creative document by the entire production team, thereby

13

establishing a direct chain of access to Defendants ACP, SKG, and OBB, who were all involved in the film's creation.

62.     Without authorization from Plaintiff, Defendants copied, reproduced, distributed, and/or publicly performed Mountain Queen, which copied and embodied Plaintiff's protected Copyrighted Material by creating and distributing it in over 190 countries.

63.     Such actions constitute a violation of Plaintiff's exclusive rights under 17 U.S.C. § 106.

64.     Defendants' actions were willful, deliberate, and in conscious disregard of Plaintiff's rights.

65.     *Mountain Queen* is substantially similar to the original, unique narrative structure, pacing, and thematic emphasis, and the settings for specific scenes as set forth in the Outline, examples of which include the following:

a.  **The Original "Bookend" Narrative Structure:** The Outline's most fundamental creative choice is its narrative frame. It begins by establishing Lhakpa's humble, difficult life in Connecticut (Act 1), contrasts it with her heroic feats on Everest (Act 2), and then, crucially, *returns* to that same humble life in Connecticut for its conclusion, where she then finds her daughters beaming with pride, and a sponsorship comes out of the woodwork. (Act 3). The specific choice to juxtapose her world-record athletic achievements with the mundane, specific imagery of her taking a public bus and washing dishes at Whole Foods was a unique, thematic choice authored by the Plaintiff to create a specific emotional tone and was not a structure used in prior media about her. This "bookend" structure, which frames the extraordinary within the ordinary, is Plaintiff's original narrative invention for a film about her life. *Mountain Queen*

14

copies this exact structure, beginning and ending with scenes of Lhakpa taking the bus to her job at Whole Foods, thereby appropriating the core of Plaintiff's protected creative expression. The facts of the film are arranged in a particular manner, and *Mountain Queen* replicates this particular structure.

b. **The Entirely Original Third Act and "Happy Ending":** The Outline's entire Third Act is a detailed, original creation that provides a complete narrative resolution. This specific, invented sequence includes: (i) the hero's triumphant return from the summit; (ii) a montage of press coverage celebrating the achievement; (iii) an emotional reunion with her daughters; and culminating in (iv) a specific "Happy Ending" scene where Lhakpa speaks at an event, her daughters "beam with pride," and a benefactor comes "out of the woodwork" to offer her a sponsorship for future climbs. This event in the film was (as in the outline) likely staged for dramatic effect. The entire final narrative sequence—from the speech to the sponsorship—was not only the Plaintiff's unique and original creation, but also was a wholly original, aspirational, and fictionalized creation by Plaintiff to provide a satisfying story arc and a "Happy Ending." which Mountain Queen copies in the almost exactly same order and to the same effect, providing Lhakpa with the same "dream" resolution Plaintiff authored.

c. **Transformation of Facts into Thematic Scenes:** While many facts about Lhapka Sherpa's life were publicly known, the Outline organizes specific facts (while omitting others) into specific cinematic scenes designed to evoke particular themes and emotions. *Mountain Queen* copies these creative choices. For example:

    i.    The Outline's scene of a family dinner (Section 1F) is crafted to express the specific theme of "Hard Living, but warm with familial love." *Mountain Queen* replicates this scene not just in fact, but in tone and purpose, using the simple meal to convey the same emotional contrast that is Plaintiff's original expression.

    ii.    The Outline juxtaposes scenes of Lhakpa's mundane work life (taking the bus, washing dishes) with her dreams of Everest (Sections 2A, 2C, 3C). This is a creative choice to structure the narrative around the theme of internal longing versus external reality. *Mountain Queen* adopts this same thematic structure, cutting from scenes of her working at Whole Foods to her talking about her spiritual connection to the mountain.

d.  **Specific Narrative Roles for Characters:** While the existence of certain individuals in Lhakpa's life was a known fact, the Outline assigns them specific functions within its narrative structure. For example, the Outline casts Jennifer Lopez (Section 4A) not just as a counselor, but as an "overall savior" who is central to the film's theme of "Total Empowerment." *Mountain Queen* copies this narrative choice by featuring an interview with Ms. Lopez to fulfill the exact same thematic role designed for her in the Outline.

e.  **Arrangement of Facts, Themes, Narrative, Character Arc, and Story into a Cinematic Outline:** Distinct from any previous works regarding Lhapka Sherpa's life, the Outline is a preliminary treatment of subject matter in the form of a documentary film featuring interviews, footage shot with Lhapka on Mount Everest, scenes with her family in her home, and other distinctive elements.

66.    These structural and thematic similarities are further evidenced by numerous specific instances of copying, as fully set out in **Exhibit B** (109 pages with screenshots),

attached hereto and incorporated herein by reference. By way of example, but without limitation, these examples include:

    a.  The first part of the opening Act of the film was lifted almost verbatim from the copyrighted 2017 Outline. The opening scenes (Act 1 in the 2017 Outline) in the State of Connecticut appear in the 2024 *Mountain Queen* in the same place and in the same order as they do in the copyrighted 2017 Outline, reflecting a copying of Plaintiff's narrative structure;

    b.  After *Mountain Queen* replicates Section 1A of the Outline created by the Plaintiff in 2017 with a "backstory montage" of Mount Everest, the Country of Nepal, and the star of the movie: Lhapka Sherpa, the film, like the 2017 Outline Section 1B, begins with a shot of the Connecticut apartment where Defendant Sherpa lives. This specific sequencing is Plaintiff's original expression.

    c.  The 2017 Outline states in Section 1C, "Lhakpa interacts with her two daughters, Sunny (12) and Shiny (9) (Mother and daughters bond) tighter than usual based upon the abuse they have all endured. Lhakpa is unable to help with their schoolwork as she is still learning to read and write. "Emotional resentments?" *Mountain Queen* then shows Lhakpa talking about her hardships and trauma with her daughters, which are strikingly identical to the character dynamics and thematic focus selected by Plaintiff in the 2017 Outline.

    d.  Section 1F of the 2017 Outline states: "Dinner is pretty simple as Lhakpa makes $400 per week, she can't afford English lessons, school trips or any extras for that matter. Hard Living, but warm with familial love." Where the 2024 *Mountain Queen* movie visually depicts the same financial struggles and familial warmth of Lhakpa's life, mirroring the Goddess of the Sky 2017 Outline's description of her as "hard living, but warm with familial love." This

17

direct replication of the 2017 Outline exemplified by this scene, showing the preparation and eating of a basic family dinner, constitutes a clear and substantial appropriation of the 2017 Outline's original characterizations and thematic expression.

e. *Mountain Queen* again mirrors the 2017 Outline that states in Section 1G "As the hours dwindle, we feel just how tight the living quarters are. All three family members live in the same room." As such, throughout the dinnertime sequence, the film highlights and emphasizes the cramped living conditions of the family, duplicating the 2017 Outline's selection and emphasis of this specific detail to create a particular mood and setting, which is protectable.

f. Next, *Mountain Queen* shows Lhakpa Sherpa walking and taking the bus to work at Whole Foods, and feeling free when she leaves, and thinking about Mount Everest. All of these elements are found in the 2017 Outline, specifically in Section 2A, "Lhakpa walks everywhere, she doesn't drive. Immigrant Angle -Timely-American dream is still alive and well," and in Section 2C, "Lhakpa buses herself to work at Whole Foods where she washes dishes for 8 hours a day." The choice to juxtapose the mundane reality of her job with the dream of Everest is a creative narrative choice by Plaintiff that was copied. Section 3A of the 2017 Outline states, "Back to the apartment after work, or walking to pick up the girls from school. There is no carpool." In *Mountain Queen*, Lhakpa goes back to the apartment after her shift at Whole Foods. The film also references Lhakpa walking her daughters to school when they were younger. Although the 2017 Outline specified that the girls would have been approximately 12 and 9 years old at the time of writing, by the time the film was shot, they no longer required someone to walk them to school. However, the 2017 Outline details in

18

Sections 3D, 3E, and 3F "All three live in fear of their father and ex-husband, and make sure to bolt the door. They look over their shoulders and are very aware of their surroundings just in case he comes back"; "George threatened to kill them all. We get the picture of how bad life was for Lhakpa and the children"; and "Abusive relationship, no money to get away, emotionally and physically trapped in a foreign country. She didn't leave him for 10 years. Why?" So, even though the girls had aged (and even with the death of the children's father: George Dijmarescu, which would have eliminated this threat), the producers of *Mountain Queen* chose to retain these key and distinct thematic and narrative elements, further demonstrating a substantial reliance on the original 2017 Outline's creative choices.

g.  Continuing on, Section 4A states "Jennifer Lopez works at the Connecticut Women's Shelter. She was/is Lhakpa's counselor, friend, and overall savior. Jennifer actually hid the children and Lhakpa from George. She has been by Lhakpa's side since they met." Just as in the Outline, Jennifer Lopez is also interviewed in *Mountain Queen*, where she is characterized and presented by the filmmakers almost identically to how she was depicted in the Plaintiff's 2017 Outline, fulfilling the specific narrative role Plaintiff designed for her.

h.  In Section 5B, the *Outline* states, "Emotional goodbyes to the children as she leaves them for 2 months." Then *Mountain Queen*e captures the heartfelt farewells between Lhakpa and one of her children as she prepares to leave her for two months, aligning closely with the Outline's original articulation of this scene. Also, Section 5E "THE CONVERSATION about potential death" just as planned in the 2017 Outline, takes place in *Mountain Queen*.

19

i. In Act 2, Section 6B states, "She never trained (Potential shoot of a training session with sponsor gear)." Just as in the 2017 Outline, there is a strikingly similar training session with likely sponsored gear featured prominently in *Mountain Queen*.

j. Section 8B states "Physical and emotional walls" which is reflected in the movie, where, while traveling to Mount Everest, Lhapka recounts her "emotional walls" of her past relationship with her ex-husband George. *Mountain Queen* also substantially details in a similar manner the 2017 Outline's focus on her troubled emotional relationship in addition to the actual physical challenges of climbing the mountain itself (the "physical wall"), copying Plaintiff's central theme of internal versus external struggles.

k. Section 9G of the 2017 Outline states, "Potential climber Profiles-Melissa Arnot (climber who is one summit less than Lhakpa)-Dave Watson, who knew Lhakpa's ex-husband. He witnessed the abuse firsthand." In *Mountain Queen*, just as planned in the Outline, Dave Watson, George Dijmarescu's climbing partner and best friend, is interviewed. But Mr. Watson did not speak about his dead friend's abusive behavior. Instead, the abuse narrative, as set out in the Outline, was provided for in the film by climber and author Michael Kodas, an eyewitness to the abusive behavior, where all three had been on the same 2004 Connecticut-based Mount Everest climbing expedition.

l. In the Outline, Act 3 Section 14A states "Meeting her daughters and sister back in Katmandu-celebratory tears-hugs that last a lifetime." In *Mountain Queen*, the celebration is substantially similar and mirrors the Outline except it takes place at Base Camp, because one of Lhapka's daughters went to Base Camp with her versus staying in Kathmandu as originally planned in the Outline.

20

m. Section 14B of the Outline "Celebration ensues-Press potential from all outlets-World Record Breaking climb" where in *Mountain Queen*, as planned and codified in the Outline, immediately after Lhakpa's climb, the press coverage is shown in Kathmandu.

n. Section 15A from the Outline sets the scene of "Back to her humble life off the mountain." The "unknown hero" (as she is called in Section 1E) returns to Connecticut to her humble life off the mountain shown in the beginning of the film. Now bookended, just like as planned and articulated in the Outline, the *Mountain Queen* viewer again sees Lhakpa taking the bus and going to Whole Foods to work, which is substantially and strikingly similar to Plaintiff's copyrighted narrative structure.

o. Sections 15B and 15C "Talking/Showing slides of the expedition to students at her daughter's school" and 15C, where "Both daughters beam with pride," where slides of the climbing expedition being shown to students at her daughter's school were replaced with Lhakpa receiving an award. Otherwise, *Mountain Queen* mirrored this scene in the Outline to a tee. Lhakpa's daughters are shown beaming with pride as her exploits of her climbing are being talked about on stage. Lhakpa receives a standing ovation and walks off the stage. We then see a woman speaking with Lhakpa. The woman tells her what an inspiration she is and that her family's company is going to sponsor her for any climb or expedition she wants. This was Lhakpa's dream in the same exact sequence that was detailed in the Outline.

p. Section 15D of the Outline states, "Sponsor giveaway potential," and in *Mountain Queen*, a sponsor, comes out of the woodwork at the end of the film, just as planned for in the Outline. Lastly, Section 15E details a "Happy ending"

21

where, in *Mountain Queen,* there is the same exact Happy ending where Lhakpa gets her new sponsorship offer to climb anywhere she wants.

67.    All of these elements, with many others, shown in Exhibit B, all of which are incorporated herein by reference, appeared in *Mountain Queen* after Defendant Sherpa received Plaintiff's Copyrighted Material. This striking similarity underscores the unmistakable copying of this critical narrative and visual elements from Plaintiff's work.

68.    The recurrence of this highly-specific and thematically integral narrative detail—used throughout the film- is evidence of the fact that Defendants had access to, and followed, Plaintiff's Copyrighted Material when developing *Mountain Queen*.

69.    The strikingly parallel depiction and sequencing of Lhakpa Sherpa's lifestyle and activities involving her summiting Mount Everest - first appearing in the Plaintiff's 2017 Copyrighted Outline and then in the 2024 *Mountain Queen* is neither incidental nor coincidental and could only have been derived from Plaintiff's Copyrighted Materials.

70.    These narrative parallels, particularly the idiosyncratic use of a timeline of events and similarities in the pacing, which parallel between Mountain Queen and the Outline, are unique and complex enough to render the similarities between Plaintiff's Outline and Defendants' movie substantially similar. In the event that access is not proven, they ALSO show "striking similarity" within the meaning of the law. The specificity and sequencing of these elements preclude the possibility of coincidence, independent creation, or reliance on a common source.

71.    Plaintiff alleges that Defendants' conduct was knowing, intentional, willful, and in conscious disregard of Plaintiff's exclusive rights, and Defendants continue to infringe Plaintiff's copyright by streaming and distributing Mountain Queen globally without license or legal entitlement.

22

72. Due to both its participation in the California lawsuit and the cease-and-desist letters sent to Defendant, Defendant Netflix knew or should have known that Plaintiff had a copyrightable interest in the film prior to its worldwide release.

73. Without any authorization, permission, consent, or license from Plaintiff, Defendant Netflix publicly performs, publicly displays, and distributes this unauthorized adaptation of Plaintiff's Copyrighted Material to users of Defendant Netflix's website and subscription-based streaming platform by making Mountain Queen available as part of Defendant Netflix's content library and programming, thereby infringing Plaintiff's exclusive rights under 17 U.S.C. § 106.

74. At no time did Plaintiff license, authorize, permit, or consent to Defendants' reproducing, adapting, distributing, publicly displaying, or publicly performing any of Plaintiff's Copyrighted Material in any film or other medium.

75. Nevertheless, Defendants have produced, reproduced, made, streamed, and/or distributed, and continues to stream and distribute, an unauthorized adaptation of Plaintiff's Copyrighted Material in the form of *Mountain Queen*, making it available for public display and public performance around the clock every day via a global streaming platform and a worldwide subscriber base. These acts infringe Plaintiff's exclusive rights under 17 U.S.C. § 106.

76. As a direct and proximate result of Defendants' unauthorized reproduction, public performance, and distribution of Plaintiff's Copyrighted Material, Plaintiff has suffered and continues to suffer significant economic, reputational, and personal harm, and damage to professional relationships within the industry.

77. Plaintiff's injuries include, but are not limited to:

a. lost income and licensing fees;

b. loss of market value of the Copyrighted Material;

c.       harm to reputation and goodwill;

d.       dilution of the Copyrighted Material's value; and

e.       financial, reputational, and professional consequences directly resulting from Defendants' actions.

78.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to an award of actual damages and profits attributable to the infringement, or alternatively; statutory damages pursuant to 17 U.S.C. § 504(c).

79.     Plaintiff also seeks injunctive relief, attorneys' fees, and costs pursuant to 17 U.S.C. § 502 and 505.

## FIFTH COUNT – CONTRIBUTORY COPYRIGHT INFRINGEMENT

**(Against Defendants ACP, SKG, OBB Media, MakeMake, and Netflix)**

80.     Paragraphs 1 through 33 and 49 through 79, set forth above, are hereby incorporated by reference as if fully set forth herein.

81.     The Defendants ACP, SKG, OBB Media, MakeMake, and Netflix (collectively the **"Contributory Defendants"**) knowingly induced, caused, or materially contributed to the direct copyright infringement by Defendant Sherpa and each other.

82.     The Contributory Defendants possessed knowledge of the direct infringement.

83.     Actual knowledge is supported by:

a.   The Plaintiff's prior state court contract lawsuit.

b.   The pre-release cease and desist email was sent to SKG in December of 2023.

c.   The letter mailed by Plaintiff's counsel to Netflix Registered Agent was received on May 6, 2024, and emailed to Netflix General Counsel on May 13, 2024.

d. The letter was mailed and emailed by Plaintiff's counsel to Netflix IP Counsel, Kayla A. Xavier, Esq., and to Defendants Sherpa, ACP, and SKG's counsel, Jody Zucker, Esq., and mailed to OBB Media on July 1, 2024.

84. The Contributory Defendants, as sophisticated entities in the film industry with extensive experience in content acquisition and rights clearance, had constructive knowledge of the infringement because the similarities between *Mountain Queen* and the Copyrighted Material are so striking that copying is the only plausible explanation, particularly given their primary collaborator, Defendant Sherpa, had direct possession of and access to the Copyrighted Material during the relevant time period.

85. Furthermore, these Contributory Defendants had actual knowledge of the infringement. Plaintiff provided the Contributory Defendants with actual notice of his rights and the ongoing infringement via correspondence prior to the film's global release on Netflix.

86. Despite possessing this knowledge, the Contributory Defendants intentionally and materially contributed to the infringement. Their respective contributions were indispensable to the creation and distribution of the infringing work.

87. Defendants ACP, SKG, OBB Media, and MakeMake made the infringement possible by providing the essential financing, production equipment, personnel, and creative services necessary to transform the copied elements of Plaintiff's Outline into the infringing film. Without these material contributions, the infringing film would not have been created.

88. Defendant Netflix materially contributed to the infringement by providing its global streaming platform, an essential facility for the widespread public performance and distribution of *Mountain Queen*. Without Netflix's distribution, the infringement would not have reached a worldwide audience and caused such extensive harm without Netflix's indispensable contribution.

25

89.     By knowingly taking these actions, the Contributory Defendants induced and materially contributed to the copyright infringement and are therefore contributorily liable. Their conduct was willful.

90.     As a result of Defendants' unlawful conduct, Plaintiff is entitled to an award of actual damages and profits attributable to the infringement, or alternatively; statutory damages pursuant to 17 U.S.C. § 504(c).

**SIXTH COUNT – VICARIOUS COPYRIGHT INFRINGEMENT**

**(Against Defendants ACP, SKG, OBB Media, MakeMake, and Netflix)**

91.     Paragraphs 1 through 33 and 49 through 79, set forth above, are hereby incorporated by reference as if fully set forth herein.

92.     The Defendants ACP, SKG, OBB Media, MakeMake, and Netflix (collectively the **"Supervising Defendants"**) had the right and ability to supervise and control the infringing activities of the direct infringers.

93.     ACP, SKG, MakeMake, and OBB controlled production and creative development of the infringing film.

94.     Netflix controlled distribution and had discretion to accept or reject the project, as well as the ability to continue or stop streaming of infringing film.

95.     All Defendants profited directly from the infringing film (awards, subscriptions, prestige, etc.).

96.     Defendants SKG, ACP, OBB Media, and MakeMake, as the production companies that financed and created *Mountain Queen*, exercised direct practical control over the film's content. This control included making decisions about the creative direction, narrative structure, scene selection, and final edit of the infringing film, and they had the power to prevent the incorporation of Plaintiff's copyrighted expression into the final work.

97.    Defendant Netflix, as the exclusive worldwide distributor, possessed the right and ability to supervise and control the infringing activity by controlling its public distribution. Netflix had the authority to accept or reject the film for distribution and to remove it from its platform, thereby controlling whether the infringement reached a global audience.

98.    Each of the Supervising Defendants received a direct financial benefit from the infringing activity. The nexus between the Defendants' control and their financial benefit is direct: by controlling the creation and distribution of the infringing film, they ensured its commercial exploitation from which they directly profited.

99.    The production companies SKG, ACP, OBB, and MakeMake received revenue, profits, and enhanced business reputation directly attributable to the commercial exploitation of *Mountain Queen*.

100.    Defendant Netflix derives a substantial direct financial benefit from the infringing film in the form of increased subscription revenue from new and existing members who watch the film, enhanced value of its content library, and significant promotional and marketing advantages. The ongoing exploitation of the film on its global platform, even after receiving multiple detailed notices of Plaintiff's claims, demonstrates willful and disregard for Plaintiff's rights and constitutes clear evidence of both willful blindness and its substantial direct financial interest in the continued infringement.

101.    Because the Supervising Defendants possessed both the right and ability to control the infringing conduct and received a direct financial benefit from it, they are vicariously liable for the copyright infringement.

102.    Plaintiff seeks damages, statutory damages, injunctive relief, and attorneys' fees pursuant to 17 U.S.C. §§ 502, 504, and 505.

### SEVENTH COUNT – VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

**(Against All Defendants)**

103.    Paragraphs 1 through 102, set forth above, are hereby incorporated by reference as if fully set forth herein.

104.    At all relevant times herein, the Defendants were engaged in trade or business as those terms are defined in the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§42-110a, et seq. **("CUTPA**").

105.    The unlawful and improper actions of the Defendants, as described herein, constitute unfair and deceptive acts or practices in the conduct of a trade or business in violation of CUTPA for one or more of the following reasons:

a. The Defendants' acts and/or practices were deceptive in that they have a tendency and capacity to deceive, by misappropriating Plaintiff's work and presenting it to the public as their own original creation;

b. The Defendants' acts and/or practices violate public policy as it has been established by statutes, common law, or otherwise, including, inter alia, the public policies against breaching contracts, breaching the covenant of good faith and fair dealing, unjust enrichment, tortious interference in a contractual relationship, tortious interference with business expectancies, aiding and abetting breach of contract, and the policies embodied in the federal Copyright Act;

c. The Defendants' acts and/or practices are immoral, unethical, and/or unscrupulous, as they involve the intentional and surreptitious taking of Plaintiff's creative work for their own commercial gain after Plaintiff had developed it in good faith with Defendant Sherpa; and/or

d.  The Defendants' acts and/or practices have caused substantial injury to the Plaintiff, which he could not reasonably have avoided, and which is not outweighed by any countervailing benefits to consumers or competition.

106.   A substantial nexus exists between the out-of-state Defendants' conduct and trade or commerce within Connecticut. The entire business relationship and the underlying creative work at issue centered on a Connecticut resident, Defendant Sherpa. The wrongful conduct was initiated in part in Connecticut through Defendant Sherpa's breach of contract and misappropriation of the Copyrighted Material. The harm was directed at a business enterprise (the development of the Concept) centered on a Connecticut resident, thereby causing foreseeable injury within the state and impacting its trade and commerce.

107.   As a result of the foregoing, the Plaintiff has suffered and, if the relief sought herein is not granted, will continue to suffer an ascertainable loss of money and/or property.

108.   Pursuant to Conn. Gen. Stat. § 42-110g(c), a copy of this Amended Complaint has been mailed to the Connecticut Office of the Attorney General and the Connecticut Commissioner of Consumer Protection.

WHEREFORE, the Plaintiff demands judgment against the Defendants as follows:

As to all counts:

1.   Compensatory damages in an amount to be determined at trial; and

2.   Such further legal and equitable relief as the Court deems proper.

As to the First and Second Counts:

1.   Damages for breach of contract and breach of the covenant of good faith and fair dealing against Defendant Sherpa.

As to the Third Count (in the alternative):

1.   Disgorgement of all benefits unjustly received by Defendant Sherpa and restitution to Plaintiff.

29

As to the Fourth, Fifth, and Sixth Counts:

1.      That the Defendants, their affiliates, agents, and employees be permanently enjoined from infringing Plaintiffs' copyrights in and to the Plaintiff's copyrighted works, pursuant to 17 U.S.C. §502;

2.      That the Plaintiff be awarded all direct or indirect profits of Defendants, the damages to Plaintiff and any other monetary advantage gained by Defendants through the infringement, the exact sum to be proven at the time of trial;

3.      Alternatively, an award of Statutory damages pursuant to 17 U.S.C. § 504(c), including enhanced damages for willful infringement;

4.      That the Plaintiff be awarded the costs of this action and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

As to the Seventh Count:

1.      Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a); and

2.      Costs and reasonable attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g(d).

                                ALAN M. BLASSBERG


                                By: /s/ Joseph B. Burns_____
                                    Joseph B. Burns
                                    Fed. Bar No. ct00403
                                    Crumbie Law Group, LLC
                                    Hartford, CT   06103
                                    Tel. (860) 725-0025
                                    Fax:  (860) 760-0308
                                    Email:  jburns@crumbielaw.com


                                By: /s/ Noel C. Pace            .
                                    Noel C. Pace
                                    Fed Bar No. 1017065(FL)
                                    The Law Offices of Noel C. Pace,
                                    PLLC
                                    8661 NE 2nd Ave., El Portal,
                                    Florida, 33138-3003

Tel: 305-219-1191
Email: noel.c.pace.esq@gmail.com


By:   /s/ Elysa Galloway          .
Elysa Galloway
Fed. Bar No. 1022194(FL)
The Law Offices of Elysa Galloway,
PLLC
2385 NW Executive Center Drive,
Suite 100
Boca Raton, FL 33431
Tel: (954) 998-3828
Email:
elysa@elysagallowaylaw.com;
gallowayatlaw@gmail.com

32

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 29, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 /s/ Joseph B. Burns_____
Joseph B. Burns
