**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

ALAN M. BLASSBERG,
    *Plaintiff*,

v.

LHAKPA SHERPA, NETFLIX, INC.,
SK GLOBAL ENTERTAINMENT, INC.,
AVOCADO & COCONUTS PRODUCTIONS, LLC,
MAKEMAKE, LLC and OBB MEDIA, LLC,
    *Defendants*.

No. 3:24-cv-02034-MPS

---

## <u>RULING ON MOTIONS TO DISMISS</u>

### I.    Introduction

The plaintiff, Alan M. Blassberg ("Blassberg"), brings this action against Lhakpa Sherpa ("Sherpa"), Netflix, Inc. ("Netflix"), SK Global Entertainment, Inc. ("SK"), Avocado & Coconuts Productions, LLC ("A&C"), MakeMake, LLC ("MakeMake") and OBB Media, LLC ("OBB") (collectively, the "Defendants") for claims related to a documentary film about the life and achievements of Sherpa, who has summitted Mount Everest more times than any woman in the world. The Defendants have filed motions to dismiss the operative complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). ECF Nos. 80; 83; 85. For the reasons set forth below, I GRANT the motions to dismiss as to all claims except the breach of contract and unjust enrichment claims against Sherpa.

### II.    Factual and Procedural History

#### A.  <u>Factual Background</u>

The following facts, taken from the operative complaint, ECF No. 73, are accepted as true for the purpose of this motion. I set forth only the facts relevant to the three motions to dismiss.

1

Blassberg is a resident of California and "an award-winning television and film producer . . . with over 25 years of film industry experience." *Id.* ¶ 1. Sherpa is a resident of Connecticut and "an internationally recognized mountain climber." *Id.* ¶ 2.

On August 28, 2014, Blassberg and Sherpa entered into a contract ("Contract One") to develop and produce an original television, film, or media account of Sherpa's life and achievements as a mountain climber (the "Concept"). *Id.* ¶ 11. Contract One provided that the term of the contract was for an eighteen-month period beginning August 28, 2014, and provided that the "parties would work together to develop and market the Concept for sale, option and/or other disposition." *Id.* ¶ 11(a)–(b). Contract One further provided that, during its term, "neither party would negotiate or enter into any contract for a television, film, literary/digital media project substantially similar to the Concept, other than with [Blassberg] or [a] party designated by [Blassberg]." *Id.* ¶ 11(d). Contract One also provided that for twelve months following its expiration, "the parties agreed they would not enter into an agreement with respect to the development and/or production of any project similar in nature to the Concept unless the Plaintiff was also attached as Executive Producer on any such project." *Id.* ¶ 11(g).

On August 13, 2016, Blassberg and Sherpa entered into another contract ("Contract Two") that extended the term of Contract One through August 28, 2017, "with all of the other terms and conditions of Contract One to remain in full force and effect." *Id.* ¶ 12.

On December 23, 2017, Blassberg and Sherpa entered into another agreement ("Contract Three") "whereby they agreed to extend the Term of Contract One, as amended by Contract Two, through December 23, 2018, with all of the other terms and conditions of Contract One to remain in full force and effect." *Id.* ¶ 13. Contract Three included a "life story" agreement whereby Sherpa

2

granted Blassberg "permission to use her personal details and characteristics, including her image, name, likeness, and experiences in connection with the Concept." *Id.*

Blassberg authored an outline (the "Outline") of his "creative vision" for the Concept, which he completed in early 2017. *Id.* ¶ 14. In April 2017, Blassberg and members of his production team traveled to Nepal to meet with Sherpa and her brother, who were both handed copies of the Outline. *Id.* ¶ 15.

Blassberg alleges that "Sherpa entered into a business relationship" with A&C on or before December 23, 2018, while Contract Three "was in force and effect." *Id.* ¶ 16. On November 19, 2019, the "founder and CEO" of A&C "posted on her Instagram social media account, that '[f]or the past year, [A&C] has been working on a very special and important film project about [Sherpa]…'" (the "Film Project") and A&C "posted identical content on its Instagram social media account" on the same date. *Id.* ¶ 17. On or around November 3, 2021, A&C "entered into a formal 'life story' agreement with Sherpa in connection with the [Film] Project." *Id.* ¶ 20. On June 22, 2022, A&C "caused to be registered with the U.S. Copyright Office 'Life story: Lhakpa Sherpa; documentary' noted as 'Agreement,' effective November 3, 2021." *Id.*

Blassberg alleges that he first learned of Sherpa's "involvement with third parties in the development and/or production of a project similar in nature to the Concept in early January 2022, when he was alerted to the social media postings" of A&C. *Id.* ¶ 21. In January 2022, Blassberg, through counsel, contacted A&C to "express concerns" about the Film Project and that Sherpa was in breach of contract. *Id.* ¶ 22. A&C's CEO responded that "there are no third-party obligations of [Sherpa]'s that have any bearing on my company's work with her," and "continued to ignore and/or dismiss" Blassberg's concerns. *Id.* ¶¶ 23, 27. Sherpa's counsel denied any breach of contract. *Id.* ¶ 25.

3

Blassberg contends that A&C subsequently executed multiple agreements related to the Film Project with an entity related to SK and recorded them with the U.S. Copyright Office. *Id.* ¶ 24. A&C and Sherpa entered into an amended "life story agreement" effective April 6, 2022 that A&C recorded with the U.S. Copyright Office on June 22, 2022. *Id.* ¶ 24(b).

In September 2023, an employee of A&C "posted on his Instagram social media account that Defendant Netflix had 'picked up' the [Film] Project, now titled *Mountain Queen: The Summits of Lhakpa Sherpa* ("*Mountain Queen*")" and that "since 2018[, A&C] had been working with" Sherpa, SK, and OBB "to capture the remarkable life" of Sherpa. *Id.* ¶ 28. *Mountain Queen* had its "world premiere" at the Toronto International Film Festival on September 8, 2023. *Id.* ¶ 29. On July 31, 2024, Netflix released *Mountain Queen* on its video streaming service. *Id.* ¶ 31. Since its release, *Mountain Queen* has been nominated for and/or received numerous awards. *Id.* ¶ 32.

B.  Procedural History

Blassberg commenced this action on December 23, 2024. ECF No. 1. Blassberg later filed an amended complaint, ECF No. 27, to which the Defendants filed motions to dismiss. ECF Nos. 55; 61; 67. In response to the motions to dismiss, I gave Blassberg the opportunity to "file an amended complaint in which he pleads as many facts as possible, consistent with Rule 11, to address the alleged defects discussed in Defendants' memorandums of law." ECF No. 68. In response, Blassberg filed a second amended complaint, ECF No. 73, which is the operative complaint in this action. I dismissed the pending motions to dismiss as moot.

Blassberg's operative complaint alleges seven counts: breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment against Sherpa; direct copyright infringement against all Defendants; contributory and vicarious copyright infringement against all Defendants except Sherpa; and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a *et seq.*, against all Defendants. *Id.* at 8–28. Blassberg

4

seeks compensatory damages, disgorgement, profits, statutory damages, punitive damages, costs and attorneys' fees, and that Defendants be permanently enjoined from infringing his copyrights. *Id.* at 29–30.

Netflix, SK, MakeMake, and OBB filed a renewed motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. ECF No. 80 (the "Netflix Motion"). A&C and Sherpa filed their own renewed motions to dismiss under Fed. R. Civ. P. 12(b)(6), ECF Nos. 83; 85, and both joined the Netflix Motion.[1] ECF Nos. 83 at 2; 86 at 2. The Defendants argue that Blassberg fails to state a direct copyright infringement claim because he has not sufficiently alleged that Defendants had access to the Outline and *Mountain Queen* is not substantially similar to any protectable material in the Outline. ECF No. 81 at 22–42. The Defendants contend that because Blassberg's direct copyright infringement claim fails, so too do his direct and vicarious copyright infringement claims, and in the alternative, that he has failed to plead the requisite elements for contributory and vicarious copyright infringement. *Id.* at 43–47. Further, they argue that Blassberg's CUTPA claim is preempted by the federal Copyright Act. *Id.* at 47–48. Sherpa also argues that Blassberg has failed to sufficiently allege his breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment claims against her. ECF No. 86 at 5–13.

## III.    Legal Standard

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Tanvir v. Tanzin*, 894 F.3d 449, 458 (2d Cir. 2018), *aff'd*, 592 U.S. 43 (2020) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

---

[1] Because all the Defendants have joined the Netflix Motion, the Court will refer to the arguments raised therein as the Defendants' collectively.

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* And "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider documents that are "incorporated into the complaint by reference," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), or documents upon which the plaintiff "solely relies and which [are] integral to the complaint," even when the plaintiff "chooses not to attach to the complaint or incorporate by reference" those documents. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). "District courts in the Second Circuit frequently consider allegedly copied material to be incorporated by reference in, or integral to, complaints in copyright actions." *Pilla v. Gilat*, 2020 WL 1309086, at *4 (S.D.N.Y. Mar. 19, 2020) (collecting cases). Here, Blassberg does not dispute that I may consider the content of the Outline and *Mountain Queen* in deciding this motion. ECF No. 91 at 10–20 (relying on the content of *Mountain Queen* and the Outline to argue that the works are substantially similar); *see also* ECF No. 89 at 13. To the extent that Blassberg mischaracterizes the Outline or *Mountain Queen* in his allegations or his briefs, "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions, or descriptions of the works contained in the pleadings." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal citations and quotation marks omitted).

## IV.    Discussion

### A.    Direct Copyright Infringement

"To establish a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020). The Defendants do not contest ownership for purposes of the motion to dismiss. ECF No. 81 at 22 n.7. "To satisfy the second element, a plaintiff 'must demonstrate that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work].'" *Abdin,* 971 F.3d at 66 (emphasis and alteration in original). "Since direct evidence of copying is rarely possible, copying is generally established by showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir. 1993).

Blassberg concedes that his complaint does not allege direct evidence of copying. ECF No. 91 at 7 ("Where a plaintiff cannot in good faith allege direct evidence of copying, he may establish copying by sufficiently pleading . . . access . . . and . . . substantial similarity"). Therefore, the Court applies the access and substantial similarity test.

#### i.    Access

To sufficiently plead access, Blassberg must allege facts showing "that an alleged infringer had a reasonable possibility — not simply a bare possibility — of accessing the prior work. Access may not be inferred through mere speculation or conjecture." *Piuggi v. Good for You Prods. LLC*, 739 F.Supp.3d 143, 158 (S.D.N.Y. 2024) (internal citations, quotation marks, and alterations omitted). Access may be established by alleging "either (1) a particular chain of events . . . by

which the defendant might have gained access to the work; or (2) facts showing that plaintiff's work was widely disseminated, such that access can be inferred." *Clanton v. UMG Recordings, Inc.*, 556 F. Supp. 3d 322, 328 (S.D.N.Y. 2021) (internal citation and quotation marks omitted).

Blassberg does not allege that the Outline was widely disseminated, as he did not register it with the Copyright Office until July 27, 2024, *after* Mountain Queen had its "world premiere." ECF No. 73 ¶¶ 29, 50; *Gal v. Viacom Int'l, Inc.,* 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007) ("Where a work is unpublished, as in the case at bar, it is considered not to have been widely disseminated."). Therefore, to plead access, Blassberg's complaint must allege specific facts to show that, through a particular chain of events, it is reasonably possible that the Defendants gained access to the Outline.

Blassberg makes the following non-conclusory allegations that could support this chain of events. In April 2017, Sherpa and her brother were given copies of the Outline at a pre-production meeting in Nepal. ECF No. 73 ¶ 15; *see also id.* ¶ 57. "[S]hortly thereafter, Defendant Sherpa began working directly with [A&C] . . . to develop the film that would become *Mountain Queen*. Given this collaborative relationship . . . it is a reasonable and plausible inference that Defendant Sherpa provided the Copyrighted Material to [A&C] and its agents to guide the development of the *Mountain Queen*." *Id.* ¶ 57. "On or before March 2021, [A&C] began working with [SK] and/or its affiliate . . ." *Id.* ¶ 59; *see also id.* ¶ 24. "Subsequently, [A&C], in its effort to secure financing and production partners, entered into a close working relationship with Defendants [SK], OBB, and MakeMake. It is a reasonable inference that [A&C] provided the Copyrighted Material to these financial backers to demonstrate the creative vision and commercial viability of the project." *Id.* ¶ 60; *see also id.* ¶ 19. I find that these facts, accepted as true for the purposes of this motion, are sufficient to suggest that Sherpa, A&C, SK, OBB, and MakeMake had a reasonable possibility of

8

accessing the Outline because Blassberg has alleged that the parties' relationship was that of "production partners" and involved the "creative vision" for the Film Project. *See Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*, 2019 WL 1382341, at *6 (S.D.N.Y. Mar. 27, 2019) ("Access through an intermediary may be inferred if the intermediary has a close relationship with the infringer. Such a relationship exists, for example, if the intermediary supervises or works in the same department as the infringer or contributes creative ideas to the infringer.") (internal citation, quotation marks, and alteration omitted); *see also Gaste v. Kaiserman,* 863 F.2d 1061, 1067 (2d Cir. 1988) ("Access through third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work.").

But Blassberg's complaint makes no allegations connecting Netflix to this chain of events, and therefore it fails to suggest that Netflix had a reasonable possibility of accessing the Outline. The Second Circuit has held that a plaintiff may avoid the access requirement if the two works in question are "strikingly similar." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 56 (2d Cir. 2003) ("where the works in question are 'so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.'"). But, as explained below, the Outline and *Mountain Queen* are not even substantially similar, a lower threshold than striking similarity. *Webb v. Stallone*, 910 F. Supp. 2d 681, 687 (S.D.N.Y. 2012), *aff'd,* 555 F. App'x 31 (2d Cir. 2014) ("where plaintiff relies on the 'striking similarity' doctrine to avoid proving access, the 'threshold required to establish striking similarity is 'stringent,' and it requires more than a showing of substantial similarity.'"); *Klauber Bros., Inc. v. URBN US Retail LLC*, 2023 WL 1818472, at *5 (S.D.N.Y. Feb. 8, 2023) ("In failing to allege substantial similarity, it follows that Plaintiff is unable to allege that the 'works in question are 'so strikingly similar as to preclude the possibility of independent creation.''"). Therefore, Blassberg's direct copyright infringement claim

9

against Netflix fails because it does not allege access, and, as explained below, the claim against all Defendants fails because the works are not substantially similar.

### ii. *Substantial Similarity of Protectable Material*

The second element of Blassberg's claim for direct copyright infringement requires that a substantial similarity exist between *Mountain Queen* and the protectible elements of the Outline.[2] Because there is no substantial similarity, Blassberg's copyright claim fails.

"[A] determination of substantial similarity requires a 'detailed examination of the works themselves,'" *Williams v. Crichton,* 84 F.3d 581, 583 (2d Cir.1996), and asks "whether a lay observer would consider the works as a whole substantially similar to one another." *Id.* at 590. "When . . . a work contains both protectible and unprotectible elements, we must take care to inquire only whether 'the *protectible elements, standing alone,* are substantially similar.'" *Id.* at 588. The Second Circuit calls this the "more discerning" test. *Gaito*, 602 F.3d at 66.

Blassberg concedes that facts contained in the Outline are not copyrightable, *see Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344, 348 (1991) ("facts are not copyrightable . . . copyright protection may extend only to those components of a work that are original to the author."), but contends that "the Defendants have copied aspects of [his] particular manner of selecting, coordinating, excerpting, modifying, and arranging those facts." ECF No. 91 at 12. In addition to facts, "'scenes a faire,' that is, scenes that necessarily result from the choice of a setting or situation" are unprotectible. *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 50 (2d Cir.1986). Likewise, copyright protection does not extend to "'stock' themes commonly linked to

---

[2] Blassberg did not attach a copy of the Outline to any of his pleadings. The Netflix Defendants provided a copy of the Outline with added numbering. ECF Nos. 57-2; 81 at 29 n.9 ("Because the bullet points in the Outline are not numbered, for ease of analysis, an annotated version of the Outline with sequential numbering imposed next to the bullet points is attached . . ."). Because the Outline is referred to in the complaint and is integral to Blassberg's claims, it is deemed incorporated into the complaint by reference. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

a particular genre," *id.,* or "standard storytelling device[s]." *Leary v. Manstan*, 118 F. Supp. 3d 460, 468 (D. Conn. 2015). A copyright "extends only to [the] particular expression of ideas, not to the ideas themselves." *Walker*, 784 F.2d at 48.

The Second Circuit has cautioned, however, that the "more discerning ordinary observer test" is not an invitation to engage in piecemeal comparison of each protectable element with its alleged imitation. *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003) ("[W]hile the infringement analysis must begin by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, infringement analysis is not simply a matter of ascertaining similarity between components viewed in isolation."); *Gaito,* 602 F.3d at 66 ("we have disavowed any notion that we are required to dissect the works into their separate components, and compare only those elements which are in themselves copyrightable") (quotation marks and alteration omitted). Rather, the Court must compare the works' "total concept and overall feel . . . as instructed by our good eyes and common sense." *Id.* (internal quotation marks omitted). "[I]n the end, [the] inquiry necessarily focuses on whether the alleged infringer has misappropriated 'the original way in which the author has selected, coordinated, and arranged the elements of his or her work.'" *Id.* Therefore, "*dissimilarity* between some aspects of the works will not automatically relieve the infringer of liability, for 'no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.' It is only when the similarities between the protected elements of plaintiff's work and the allegedly infringing work are of 'small import quantitatively or qualitatively' that the defendant will be found innocent of infringement." *Williams*, 84 F.3d at 588 (internal citation omitted).

"[B]ecause the question of substantial similarity typically presents an extremely close question of fact, questions of non-infringement have traditionally been reserved for the trier of

11

fact." *Gaito,* 602 F.3d at 63 (internal citation omitted). However, "it is entirely appropriate for a district court to resolve that question as a matter of law, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Id.* (internal quotation marks and citation omitted). "These same principles hold true when a defendant raises the question of substantial similarity at the pleadings stage on a motion to dismiss." *Id.* at 64. Thus, where, as here, the works upon which the plaintiff has relied in bringing the action are referenced in the complaint and are integral to his claims, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Id*. If the district court determines that the two works are not substantially similar as a matter of law, it "can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal,* 556 U.S. at 679).

To apply this test to films and books, courts "examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting," *Williams*, 84 F.3d at 588, as well as "specific similarities identified by [the] Plaintiff." *Ackerman v. Pink*, 2025 WL 716678, at *12 (S.D.N.Y. Mar. 6, 2025). The following are descriptions of these aspects of the works based on my review of *Mountain Queen* and the Outline.

**<u>Total concept and feel</u>**: *Mountain Queen* is an inspiring documentary about Sherpa that focuses on her spirit of perseverance, climbing achievements, and personal history of overcoming domestic violence. It is approximately 105 minutes long and features interviews, archival footage, scenes from Mount Everest, and footage of her tenth summit expedition.

In comparison, the Outline is a four-page list of ideas for a documentary centered around Sherpa's eighth attempt at climbing Everest. It contains mostly unprotectable facts and *scenes a faire*. The Outline consists of headings, sentences, and sentence fragments and is too rudimentary to convey any original overall concept or feel beyond that of a documentary about Sherpa's eighth summit attempt. *See Allen v. Scholastic Inc.,* 739 F. Supp. 2d 642, 657–58 (S.D.N.Y. 2011) ("the dramatic difference in length between *Goblet of Fire* and *Livid Land*—734 pages and 16 pages of text, respectively—immediately undermines Allen's suggestion that the authors similarly 'selected, coordinated and arranged the elements' of their work . . . *Livid Land* progresses as a series of fragmented and often tangential scenes . . . In contrast, *Goblet of Fire* is a cumulative work . . . The storyline is highly developed and complex."); *Castorina v. Spike Cable Networks, Inc.*, 784 F. Supp. 2d 107, 111–12 (E.D.N.Y. 2011) ("the [work's] vagueness . . . undercuts its protectability, because—the less 'specifics' and 'detail' it contained, the less it uniquely and imaginatively 'selected, coordinated and arranged' the stock elements contained within."); *Williams v. A & E Television Networks*, 122 F. Supp. 3d 157, 164 (S.D.N.Y. 2015) (finding no infringement where "the [plaintiff's work] does not augment these stock concepts with significant detail or imagination to render the arrangement original"). It would be more accurate to call the Outline a sketch of an expression of an idea—and a vague one at that—than to call it a "particularized expression of [an] idea," *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135–36 (2d Cir. 2004), of the sort that copyright law protects.

**Theme**: *Mountain Queen* focuses on Sherpa's bravery and determination to escape the traditional roles for women in the society she was born into and to be freed from the abusive relationship she found herself in. As a secondary theme, it features the story of her two daughters as they come to terms with the trauma of growing up in a household marked by domestic violence.

To the extent that a four-page outline can convey a theme, the Outline's theme differs from that conveyed by *Mountain Queen.* The Outline focuses on Sherpa's achievement of summitting Everest for the eighth time and contrasts that with her humble life in Connecticut. There are a few sentences about her and her daughters' history of abuse, but there is no mention of the secondary theme of her and her daughters' efforts to resolve their trauma.

Blassberg's complaint alleges that the "specific choice to juxtapose her world-record athletic achievements with the mundane, specific imagery of her taking a public bus and washing dishes at Whole Foods was a unique, thematic choice authored by the Plaintiff to create a specific emotional tone and was not a structure used in prior media about her. This 'bookend' structure, which frames the extraordinary within the ordinary, is Plaintiff's original narrative invention for a film about her life." ECF No. 73 ¶ 65(a). He contends that *Mountain Queen* "copies this exact structure," *id.,* and also copies the Outline's "creative choices" of specific scenes designed to "evoke particular themes and emotions." *Id.* ¶ 65(c). He contends these themes are "[h]ard Living, but warm with familial love" and "internal longing [for Everest] versus external reality." *Id.* These allegations exaggerate what little thematic content the Outline expresses, but, in any event, *Mountain Queen* does not copy the theme of the Outline. *Mountain Queen* conveys Sherpa's dreaming of breaking barriers for women, being free herself, and enabling her daughters to come to grips with their past more than it conveys any theme of dreaming of mountains or climbing. And the film focuses on Sherpa's resilience and fortitude more than it does her "hard" living conditions. Further, as the Defendants point out, framing Sherpa's athletic achievements within the very "ordinary" aspects of her life is not original and was done by others before Blassberg wrote the Outline; it is therefore not protectable. ECF Nos. 81 at 33; 57-9 at 1 (*7-Eleven worker becomes first woman to climb Mount Everest seven times*, Reuters (May 20, 2016)); *Feist*, 499

14

U.S. at 348 ("copyright protection may extend only to those components of a work that are original to the author.").

**Plot**: The Outline's sketch for a plot follows Sherpa from her humble and difficult life in Connecticut with her daughters to her travel to and preparation to attempt to summit Everest for the eighth time, to a reunion with her daughters, and to a triumphant return to Connecticut. ECF No. 73 ¶ 65(a) ("It begins by establishing Lhakpa's humble, difficult life in Connecticut (Act 1), contrasts it with her heroic feats on Everest (Act 2), and then, crucially, *returns* to that same humble life in Connecticut for its conclusion, where she then finds her daughters beaming with pride, and a sponsorship comes out of the woodwork. (Act 3)."). But starting at home, leaving home to overcome a challenge, and returning home is a standard storytelling device to which Blassberg is entitled to no protection. *See Leary*, 118 F. Supp. 3d at 468 (no protection for "standard storytelling device[s]").

Even if the Outline's plot was protectable, *Mountain Queen*'s is not substantially similar. *Mountain Queen* toggles between footage of Sherpa's tenth ascent of Everest, interview material where she and others recount her life, and footage and photos from her past, both before and after her time with her abusive ex-husband. The film frequently flips between Sherpa in Connecticut, Sherpa hiking Everest, her daughters, interviews with the individuals described below, and archival footage from her previous Everest expeditions and from her life in Connecticut with her ex-husband and young children. To the extent that the Outline and *Mountain Queen* both depict Sherpa at home, hiking Everest, and then returning to Connecticut, there is no copyright protection for "the presentation of historical events in the order in which they took place." *Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 595 (S.D.N.Y. 2008), *aff'd*, 351 F. App'x 516 (2d Cir. 2009).

15

Further, as Defendants point out, a book predating the Outline and covering Sherpa's fourth summit of Everest begins in Connecticut prior to the expedition, follows her summitting of the mountain, and discusses her life after returning to Connecticut. ECF No. 81 at 37 n.14 (citing *High Crimes: The Fate of Everest in an Age of Greed*, ECF No. 57-5). Therefore, the Outline's plot is not original and not protectable. *Feist*, 499 U.S. at 348 ("copyright protection may extend only to those components of a work that are original to the author.").

**Characters**: The Outline mentions Sherpa, her daughters, Jennifer Lopez (Sherpa's "counselor, friend, and overall savior" at the women's shelter in Connecticut), her brother, Melissa Arnot ("climber who is one summit less than [Sherpa],") and Dave Watson ("who knew [Sherpa]'s ex-husband . . . [and] witnessed the abuse firsthand"). ECF No. 57-2 ¶¶ 18, 44. *Mountain Queen* includes interviews with Sherpa, her daughters and brother, Jennifer Lopez, Ramona Mercado Espinoza (Sherpa's divorce lawyer), Dave Watson (who knew Sherpa and her ex-husband through mutual participation in team of Connecticut climbers with whom Sherpa climbed Everest ("Connecticut Everest Expedition")), and Michael Kodas (member of Connecticut Everest Expedition, journalist and author of *Hartford Courant* articles about Connecticut Everest Expedition and of *High Crimes: The Fate of Everest in an Age of Greed*, a book in part about Sherpa and her ex-husband on Connecticut Everest Expedition, *see* ECF No. 57-5). Most, if not all of these characters, could be considered "*characters a faire*" and would be essential to any documentary about Sherpa's life and achievements. *See Monbo v. Nathan*, 623 F. Supp. 3d 56, 95 (E.D.N.Y. 2022) ("interviews . . . are *scènes à faire* that follow naturally from the documentary format and theme of the work").

Blassberg's complaint alleges that "the Outline casts Jennifer Lopez (Section 4A) not just as a counselor, but as an 'overall savior' who is central to the film's [alleged] theme of 'Total

16

Empowerment.' *Mountain Queen* copies this narrative choice by featuring an interview with Ms. Lopez to fulfill the exact same thematic role designed for her in the Outline." ECF No. 73 ¶ 65(d). But the interview with Ms. Lopez in *Mountain Queen* is short and does not cast her as a savior. Even if it did, the inclusion of an interview with Sherpa's counselor from a domestic violence shelter where she stayed for eight months when leaving her abusive husband is properly understood as a *scene a faire* in a documentary about her life. *See B. Nagel Films, LLC v. Netflix, Inc.*, 2025 WL 2803353, at *3 (D.N.J. Oct. 1, 2025) ("nothing relating to the facts of the events that the films describe, the people they interview, and the settings they deal with can be protected by copyright law . . .  archival footage, commentary, and interviews . . . are crucial to the creation of any historically accurate film.") (internal citation, quotation marks, and alteration omitted). Further, interviewing Ms. Lopez is not original to Blassberg, as the Defendants have cited prior reporting on Sherpa that included interviews and pictures with Ms. Lopez. ECF Nos. 81 at 33; 57-17 at 3–4. *Feist*, 499 U.S. at 348 ("copyright protection may extend only to those components of a work that are original to the author.").

**Sequence**: As described above, *Mountain Queen* tells the story of Sherpa's life and history simultaneously as she climbs, toggling between her past and present. Blassberg alleges that *Mountain Queen* copies the Outline's "Third Act . . . [which] includes: (i) the hero's triumphant return from the summit; (ii) a montage of press coverage celebrating the achievement; (iii) an emotional reunion with her daughters; and culminating in (iv) a specific 'Happy Ending' scene where [Sherpa] speaks at an event, her daughters 'beam with pride,' and a benefactor comes 'out of the woodwork' to offer her a sponsorship for future climbs." ECF No. 73 ¶ 65(b).

*Mountain Queen* does have a happy ending like the Outline. But a happy ending is a standard storytelling device and not protectable. *Leary*, 118 F. Supp. 3d at 468 (no protection for

"standard storytelling device[s]"). And a documentary about any major athletic achievement would likely include press coverage celebrating the achievement and a celebration with family. These are *scenes a faire* in any documentary about a major athletic achievement, especially one as dangerous as summitting Everest.

Lastly, Blassberg's allegation that *Mountain Queen* copies the Outline's "scene where [Sherpa] speaks at an event, her daughters 'beam with pride,' and a benefactor comes 'out of the woodwork' to offer her a sponsorship for future climbs," ECF No. 73 ¶ 65(b) is belied by the Outline itself. "In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Gaito*, 602 F.3d at 64 (internal citations and quotation marks omitted). The Outline does not contain such a scene and instead includes only an idea for "Talking/Showing slides of the expedition to students at her daughter's school"; "both daughters beam with pride"; and "sponsorship giveaway potential." ECF No. 57-2 ¶¶ 60–62. The relevant (and last) portion of the Outline is reproduced below.

> **Back in-Connecticut**
>
> 59. Back to her humble life off the mountain
> 60. Talking/Showing slides of the expedition to students at her daughter's school-
> 61. Both daughters beam with pride
> 62. Sponsor giveaway potential
> 63. Happy ending

*Id.* In contrast to the Outline, *Mountain Queen* features an ending scene where Sherpa accepts an award (rather than showing slides) at a gala (not her daughter's school) and is offered a sponsorship by a business owner for future climbing (rather than a vague "sponsor giveaway potential"). The film then includes footage of her subsequent summit of K2 and interview footage of Sherpa. Simply put, "the competing work does not feature the same selection and arrangement" as the

Outline and therefore does not infringe. *Feist*, 499 U.S. at 349. *See also Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1081 n.8 (2d Cir. 2024), *cert. denied,* 145 S. Ct. 2792 (2025) ("Where the quantum of originality is slight and the resulting copyright is thin, infringement will be established only by *very close copying* because the majority of the work is unprotectable") (internal citation and quotation marks omitted).

**Pace**: The Outline cannot be said to have a "pace" and thus I cannot compare the works in this regard. Blassberg makes conclusory allegations that *Mountain Queen* copies the original "pacing" of the Outline, ECF No. 73 ¶¶ 51, 65, 70, but there is no support for such contentions in the Outline itself. The Outline contains no words or phrases that could indicate any "pace." It contains only: "We want the viewer to feel the slower pace of Lhakpa's life. She isn't tied to up to the minute electronics." ECF No. 57-2 ¶ 9. This describes a fact—that Sherpa's life is slow-paced—rather than setting out a pace for the Outline itself. Accordingly, the Outline and *Mountain Queen* are not similar with respect to pace.

**Setting**: The setting of a work encompasses where it is set in both place and time. *See DiTocco v. Riordan,* 815 F. Supp. 2d 655, 670 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012) (analyzing time period and geographical location depicted in works at issue to compare settings). *Mountain Queen* covers the period of Sherpa's life starting before she summited Everest for the first time, and the film concludes after she summited Everest for the tenth time and then summited K2. In contrast, the Outline covers Sherpa's life just prior to and after her eighth attempt to summit Everest – a much shorter time frame. ECF No. 57-2 ¶ 47. But even if the time frames were the same, settings that are "historical" are not protectable. *Canal+ Image UK Ltd. v. Lutvak,* 773 F. Supp. 2d 419, 432 (S.D.N.Y. 2011).

19

The physical settings depicted in *Mountain Queen* and the Outline are *scenes a faire* for a documentary about Sherpa's life. They include Nepal, her home and workplace in Connecticut, and Mount Everest and its various camps. These locations would be required in virtually any account of Sherpa's life. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) ("scenes a faire, that is, 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic' . . . are not copyrightable as a matter of law.") (internal citation omitted).

**Additional Specific Similarities**: The final way in which Blassberg alleges that *Mountain Queen* is substantially similar to the Outline is the "Arrangement of Facts, Themes, Narrative, Character Arc, and Story into a Cinematic Outline: Distinct from any previous works regarding Lhapka Sherpa's life, the Outline is a preliminary treatment of subject matter in the form of a documentary film featuring interviews, footage shot with Lhapka on Mount Everest, scenes with her family in her home, and other distinctive elements." ECF No. 73 ¶ 65(e). But this allegation describes only vague *scenes a faire* and is otherwise conclusory. Blassberg also incorporates a 109-page exhibit that he contends demonstrates the similarities between *Mountain Queen* and the Outline. *Id.* ¶ 66; ECF No. 73-2 at 2–110. But the Second Circuit has rejected this approach to the substantial similarity analysis because "such lists are inherently subjective and unreliable, particularly where the list emphasizes random similarities scattered throughout the works. Such a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590 (internal citation and quotation marks omitted).

When the Court parses out the unprotectable elements and *scenes a faire,* there is nothing left in the two works that could be found to be substantially similar. This is thus a case where

20

"nearly all the similarities between the works arise from noncopyrightable elements," such as non-novel ideas and *scenes a faire*. *Id.* at 588. Because the Outline and *Mountain Queen* are not substantially similar, and no reasonable minds could differ in that conclusion, Blassberg's complaint does not plausibly state a claim for direct copyright infringement. *See Gaito*, 602 F.3d at 64. Accordingly, I dismiss the direct copyright infringement claim against all Defendants.

### B. Contributory and Vicarious Copyright Infringement

Because Blassberg's claim for direct infringement fails, his claims for contributory and vicarious infringement fail as a matter of law.

The Supreme Court has recognized two theories of secondary liability for copyright infringement, "which means liability for the copyright infringement of another. Those two categories are 'contributory' liability and 'vicarious' liability." *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 964 (2026). Both theories of secondary liability depend on direct infringement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it") (internal citations omitted). Therefore, because Blassberg's direct copyright infringement claim fails, his contributory and vicarious infringement claims fail too. *Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) ("Without a showing of a direct copyright infringement, secondary liability cannot be maintained."); *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) ("there can be no contributory infringement absent actual infringement").

C.  CUTPA

The Defendants argue that Blassberg's CUTPA claim is preempted by the federal Copyright Act. ECF No. 81 at 47–48. I agree.

Section 301(a) of the Copyright Act preempts "all . . . rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . ." 17 U.S.C. § 301(a). A copyright owner has the exclusive right to reproduce, distribute, perform, display and prepare derivative works from the copyrighted work. *Id.* § 106. "[S]tate law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law" are preempted by Section 301. *Computer Associates Intl. Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir.1992) (citation omitted). If the state law cause of action requires an "'extra element' ... 'instead of or in addition to the acts of reproduction, performance, distribution or display,'" however, the cause of action is not preempted. *Id.* (citation omitted). In other words, "a state law claim is not preempted if the 'extra element' changes the 'nature of the action so that it is *qualitatively* different from a copyright infringement claim.'" *Id.*

Under the "extra element" test, state law unfair competition claims "grounded solely in the copying of a plaintiff's protected expression" are preempted by Section 301. *Kregos v. Associated Press,* 3 F.3d 656, 666 (2d Cir.1993). Likewise, when a state law unfair competition claim is based merely on a "false designation of ownership" that arose from the defendant's use of copyrighted material, it is preempted. *Id.*

Under this standard, courts in this district routinely find CUTPA claims preempted when they are based solely on the alleged copying of a plaintiff's protected work. *See A Slice of Pie Prods., LLC v. Wayans Bros. Ent.*, 392 F. Supp. 2d 297, 315 (D. Conn. 2005) ("The Second Circuit has held that claims of unfair competition and misappropriation, such as CUTPA claims, based 'solely in the copying of a plaintiff's protected expression' are preempted[.]"); *Post Univ. Inc. v.*

22

*Learneo, Inc.*, 2025 WL 2702043, at *11 (D. Conn. Sept. 23, 2025) (where "[t]he allegations are based on the same foundational acts…that Plaintiff accuses in its copyright claims… Plaintiff's CUTPA claim is preempted by the Copyright Act."); *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 2011 WL 13228167, at *17 (D. Conn. Jan. 19, 2011) ("The Second Circuit has consistently held that unfair competition claims alleging the misappropriation of content in essence seek the enforcement of rights conferred by the Copyright Act, and are thus preempted. Nehaflix's CUTPA counterclaim is therefore preempted . . .") (internal citations omitted). This is obvious when a plaintiff does not plead any factual allegations specific to his CUTPA claim and instead predicates it on the same allegations that form the basis of his infringement claim. *Leary*, 118 F. Supp. 3d at 470 ("[I]t is difficult to discern which of defendants' acts or practices are alleged to be unfair or deceptive, because plaintiff's complaint does not contain any factual allegations that are specific to the CUTPA claim. To the extent that the CUTPA claim is based on defendants' alleged copying of plaintiff's manuscript, that claim is preempted by the Copyright Act.").

Here, Blassberg's CUTPA claim is based solely on the Defendants' alleged copying of the Outline. Besides Blassberg's largely conclusory allegations that merely parrot the elements of CUTPA, ECF No. 73 ¶¶ 104–07, which the Court must disregard, *Cellular Tech. Servs. Co. v. TruePosition, Inc.*, 609 F. Supp. 2d 223, 243 (D. Conn. 2009) ("conclusory words that merely parrot . . . state remedies language are insufficient" on motion to dismiss), the complaint is clear that the CUTPA claim is based on the "misappropriation of the Copyrighted Material." ECF No. 73 ¶ 106; *id.* ¶ 105(a) ("The Defendants' acts and/or practices were deceptive . . . by misappropriating Plaintiff's work and presenting it to the public as their own original creation"); *id.* ¶ 105(b) ("The Defendants' acts and/or practices violate public policy as it has been established by . . . the policies embodied in the federal Copyright Act"); *id.* ¶ 105(c) ("The Defendants' acts

23

and/or practices . . . involve the intentional and surreptitious taking of Plaintiff's creative work for their own commercial gain."). Blassberg pleads no additional factual allegations specific to his CUTPA claim.[3] Therefore, Blassberg's CUTPA claim is preempted by the Copyright Act.

Blassberg contends that his CUTPA claim passes the "extra element" test, and is therefore not preempted, because the Defendants failed to give him credit as a Producer/Executive Producer of *Mountain Queen* and filed copyright registrations after he put them on notice of his "adverse claims." ECF No. 91 at 26–27. But neither of those actions would be deceptive, unfair, or contrary to public policy absent a Copyright Act violation. Therefore, his CUTPA claim is preempted. *See Kregos,* 3 F.3d at 666 (district court properly rejected argument that the "extra element that differentiated his case from copyright was a false designation of ownership"); *Computer Assocs.*, 982 F.2d at 716 (to avoid preemption, extra element must "change[] the nature of the action so that it is *qualitatively* different from a copyright infringement claim.") (internal quotation marks omitted). Accordingly, the CUTPA claim is dismissed.

---

[3] The CUTPA claim makes a conclusory reference to "public policies against breaching contracts, breaching the covenant of good faith and fair dealing, unjust enrichment, tortious interference in a contractual relationship, tortious interference with business expectancies," and "aiding and abetting breach of contract," ECF No. 73 ¶ 105(b), but these are not factual allegations and do not suggest that the CUTPA claim is based on any conduct other than the alleged copying of the Outline, the same conduct that is the basis for the copyright claim. Further, "[t]he majority of superior court cases considering this issue have held that a simple breach of contract claim cannot [itself support] a CUTPA claim. When the superior courts have permitted a CUTPA cause of action based on a breach of contract, there generally has been some type of fraudulent behavior accompanying the breach or aggravating circumstances." *Ruby v. Chase Manhattan Bank*, 2002 WL 725495, at *1 (Conn. Super. Ct. Mar. 25, 2002) (internal quotation marks omitted); *see also Santa Buckley Energy Ltd. v. Tiscia Corp.*, 2016 WL 3179740, at *3 (Conn. Super. Ct. May 16, 2016) ("A breach of contract claim can make out a legally sufficient CUTPA claim [only] as long as there are substantial aggravating circumstances.") (alteration omitted). So to the extent the CUTPA claim against Sherpa is based on the alleged breach of contract, it fails for lack of supporting factual allegations showing fraud or other aggravating circumstances apart from the alleged copying itself, which, as shown, is not actionable. And Blassberg does not allege any facts suggesting that Sherpa's co-defendants were aware of the terms of her contract with Blassberg when they began their dealings with Sherpa. Finally, Blassberg cites no authority suggesting that a common law tort may embody a "public policy" for CUTPA purposes.

D.  Claims Against Sherpa

Sherpa moves to dismiss the breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment claims against her. ECF No. 86 at 5–13.

i.  *Breach of Contract*

Sherpa argues that Blassberg's breach of contract claim against her fails because (1) the alleged contracts are too vague to be valid and enforceable and (2) even if the contractual prohibitions were enforceable, Blassberg has not plausibly alleged breach by Sherpa. ECF No. 86. at 5–10. I address these arguments in turn after deciding which state's laws apply to this claim.

Blassberg's complaint attaches the three contracts at issue. ECF No. 73-1 at 2–4. Contract One provides that California law governs the agreement. *Id.* at 2. Contracts Two and Three do not contain their own choice of law provisions, and Blassberg contends that the terms of Contract One are incorporated into Contracts Two and Three. *Id.* at 3–4; ECF No. 73 ¶¶ 12–13. Sherpa's motion to dismiss assumes California law governs, but contends the claims should be dismissed for the same reasons even if Connecticut law applies and under federal pleading standards. ECF No. 86 at 9–12. Blassberg's opposition to Sherpa's motion to dismiss contends that California law applies. ECF No. 89 at 4–5, 7–9. Accordingly, I will apply California law to these claims. *See OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Systems Corp.*, 503 F. Supp. 2d 490, 512, 520-22 (D. Conn. 2007) (applying New York law to substantive contract claims where contract specified that the "Agreement shall be construed and enforced under the laws of the State of New York"); *see also Elgar v. Elgar*, 238 Conn. 839, 850 (1996) ("parties to a contract generally are allowed to select the law that will govern their contract").

Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

25

defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

As to Sherpa's first argument, which pertains to the first element of the claim, I find that the alleged contracts are not too vague to be enforceable when all reasonable inferences are drawn in favor of Blassberg and his factual allegations are accepted as true. While Sherpa correctly points to ambiguous language and a few contradictory provisions, there is still enough to establish a plausible agreement at the pleadings stage.

Blassberg and Sherpa entered into Contract One on August 28, 2014. ECF No. 73-1 at 2. Contract One provided that, during its term, "both parties agree not to negotiate or enter into any contract for any television, film, literary/digital media project that is substantially similar to the Concept, other than with [Blassberg] or party designated by [Blassberg]." *Id.* Contract One also provided that for twelve months following its expiration, Blassberg and Sherpa would "not enter into an agreement with respect to the development and/or production of any project similar in nature to [the Concept] . . . unless [Blassberg] is also attached as Executive Producer on the New Project." *Id.* On August 13, 2016, Blassberg and Sherpa entered into Contract Two, which "extend[ed] the Term of [Contract One] through August 28, 2017." *Id.* at 3. Contract Two provided that "[a]ll other terms and conditions of [Contract One] shall remain in full force and effect." *Id*. After Contract Two expired, Sherpa and Blassberg signed Contract Three. *Id.* at 4. Contract Three "extend[ed] the term of [Contracts One and Two] through December 23, 2018," and provided that "[a]ll other terms and conditions of [Contracts One and Two] shall remain in full force and effect." *Id*.

When accepting these allegations as true, I can reasonably infer that the prohibition on negotiating or entering into a contract for a media project similar to the one envisioned (admittedly,

vaguely) in Contract One was effective through December 23, 2018, and the prohibition on entering into any similar agreement was effective through December 23, 2019. Sherpa's arguments that the scope of the provisions are "completely unclear," ECF No. 86 at 6, and that the contracts' language is inconsistent as to whether Contract Three supersedes or amends Contracts One and Two, *id.* at 7, do not warrant dismissal at the pleadings stage. *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."); *see also Soleimani v. White Oak Glob. Advisors, LLC*, 2025 WL 2030199, at *5 (S.D.N.Y. July 21, 2025) ("Under California law, when the facts are undisputed, as they are deemed to be on a ruling on a . . . motion to dismiss, the interpretation of a contract . . . is a question of law . . . the court can construe the language of the document on its face to determine whether as a matter of law the contract is reasonably subject to a construction sufficient to sustain a cause of action . . . if the plaintiff alleges a meaning to the document that is reasonable in light of its terms, the court cannot grant a motion to dismiss . . . Where an ambiguous contract is attached and incorporated into the complaint, the party pleading is only required to allege in a complaint the meaning which the party ascribes to that contract.") (internal citations, quotation marks, and alterations omitted).

Turning to Sherpa's second argument for dismissal, I find that Blassberg has alleged sufficient facts to render plausible his claim that Sherpa breached the contract. Blassberg makes the following factual allegations pertaining to Sherpa's alleged breach. First, he alleges that, "[o]n information and belief, on or before December 23, 2018, while the Contract was in force and effect, Defendant Sherpa entered into a business relationship with [A&C], its agents, servants, and/or employees." ECF No. 73 ¶ 16. Second, Blassberg alleges that A&C and its CEO made social media

posts on November 19, 2019 stating that "[f]or the past year, [A&C] has been working on a very special and important film project about [Sherpa]." ECF No. 73 ¶ 17. Third, Blassberg alleges that A&C "entered into a formal 'life story' agreement with Sherpa in connection with the [film project about Sherpa]. On June 22, 2022, [A&C] caused to be registered with the U.S. Copyright Office "Life story: Lhakpa Sherpa; documentary" noted as "Agreement," effective November 3, 2021." *Id.* ¶ 20. Lastly, Blassberg alleges that on September 12, 2023, an A&C agent posted on his social media account that Netflix had "picked up" *Mountain Queen,* "and that since 2018 [A&C] had been working with" Sherpa and other defendants "to capture the remarkable life" of Sherpa. *Id.* ¶ 28.

These "allegations . . ., when construed together to draw all reasonable inferences in favor of [Blassberg]," *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007), suggest that Sherpa entered into at least an oral or informal agreement regarding the development of a story about her in 2018 around the time A&C began "working with" her and later formalized this arrangement in the November 3, 2021 Agreement. Admittedly, to reach this conclusion, I have had to draw all reasonable inferences in Blassberg's favor, and even then, it is a close call. But there is enough here to find that Blassberg has plausibly alleged that Sherpa negotiated or entered into a contract for a project similar to the one envisioned in the Outline prior to December 23, 2018 and that Sherpa entered into an agreement with respect to the development of such a project prior to December 23, 2019. The motion to dismiss this claim is denied.

### ii.   Breach of the Covenant of Good Faith and Fair Dealing

Blassberg also brings a claim for breach of the covenant of good faith and fair dealing against Sherpa. ECF No. 73 at 9-10. Under California law, "[e]very contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement . . . the implied

28

covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (Ct. App. 1990) (internal citations and quotation marks omitted).

California law also provides, however, that when both a breach of contract claim and a breach of the implied covenant of good faith and fair dealing claim are based on the same underlying breach of contract, the covenant claim is considered superfluous and subject to dismissal. *Id.* at 1395 ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."); *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 716 (N.D. Cal. 2014) ("the [California] Supreme Court has made clear that when both causes of action cite the same underlying breach, the implied covenant cause of action will be superfluous with the contract cause of action. In other words, a claim alleging breach of the implied covenant of good faith and fair dealing cannot be based on the same breach as the contract claim or else it will be dismissed.") (internal quotation marks and citations omitted).

Here, Blassberg makes no separate factual allegations to support his covenant claim and alleges only that "Defendant Sherpa's actions as described herein are in breach of the covenant of good faith and fair dealing with the Plaintiff." ECF No. 73 ¶ 41. This "allegation[ is] not sufficient to state any cause of action for a breach of the implied covenant of good faith" because Blassberg has "not even attempted to plead a basis for a recovery of anything other than ordinary contract damages and [his] claim is simply duplicative of [his] contract cause[] of action and thus may be disregarded." *Careau & Co.,* 222 Cal. App. 3d at 1392. Accordingly, the breach of the covenant of good faith and fair dealing claim is dismissed.

### iii. Unjust Enrichment

In the alternative to his contractual claims against Sherpa, Blassberg also brings an unjust enrichment claim against her. ECF No. 73 at 10.

As an initial matter, the Court must determine which state's law applies to this claim. "A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). "The threshold choice of law issue in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between applicable laws of the states with a potential interest in the case." *Ultimate Nutrition, Inc. v. Leprino Foods Co.*, 747 F. Supp. 3d 371, 379 (D. Conn. 2024) (citing *Cohen v. Roll-A-Cover, LLC*, 131 Conn. App. 443, 465–66 (2011)).

The parties did not brief the choice of law analysis under Connecticut (or any other state's) law. Sherpa contends that under either California or Connecticut law, "the result is the same": the unjust enrichment claim fails. ECF Nos. 86 at 12; 93 at 7. Blassberg, on the other hand, contends that the claim survives under both states' laws. ECF No. 89 at 8.

I find, however, that there is an actual conflict of laws here. If I applied Connecticut law, the unjust enrichment claim would survive dismissal because, while a plaintiff "cannot recover under both breach of contract and unjust enrichment, plaintiffs may plead these theories in the alternative." *Stevens v. Landmark Partners, Inc.*, 2009 WL 3151327, at *4 (D. Conn. Sept. 24, 2009). Federal courts applying Connecticut law decline to dismiss unjust enrichment claims where there is a dispute about whether there is an enforceable contract, as there is in this case. *See Metzner v. Quinnipiac Univ.,* 528 F. Supp. 3d 15, 35 (D. Conn. 2021) ("in light of the parties' dispute as to the existence of an enforceable contract, dismissal of the Plaintiffs' unjust enrichment claim is inappropriate at this juncture."); *MedPricer.com Inc. v. Becton, Dickinson & Co.*, 2014 WL 3700992, at *3 (D. Conn. July 25, 2014) ("While proof of an enforceable contract might preclude

application of an unjust enrichment theory, the plaintiff may be unable to prove an enforceable contract and, at least in the early stages of the proceedings, is entitled to plead inconsistent theories.") (internal citations and quotation marks omitted). And here, Blassberg has alleged the elements of an unjust enrichment claim under Connecticut law. ECF No. 73 ¶¶ 14–15, 45–47 (alleging that he traveled to Nepal with members of his production team and authored the Outline to further the project of telling the story of Sherpa's eighth summit attempt; "Sherpa received financial and economic benefit from the time, effort, and creative work product expended and created by the Plaintiff to develop and/or produce the Concept . . . Sherpa unjustly failed to pay the Plaintiff for the benefits she received . . . the Plaintiff has sustained monetary damages"); *Michel v. Yale Univ.*, 547 F. Supp. 3d 179, 192 (D. Conn. 2021) ("Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment"). Accordingly, application of Connecticut law would permit the unjust enrichment claim to survive.

On the other hand, California law would call for dismissal of the unjust enrichment claim. Under California law, "[t]here is no cause of action for unjust enrichment. Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract." *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006). In other words, "[u]njust enrichment can be alleged to the extent it represents a remedy for some other valid cause of action." *Klaehn v. Cali Bamboo LLC*, 2022 WL 1830685, at *2 n.2 (9th Cir. May 13, 2022). Therefore, a plaintiff must "tie [his] unjust enrichment allegation to any other claim" to avoid dismissal. *Id.* at *2 & n.2. In his complaint, Blassberg's claim for unjust enrichment is not tied to any other claim. ECF No. 73 at 10. It is also not supported by any non-conclusory factual allegations unique to that claim. *Id.*

31

¶¶ 45-48. And in his opposition to Sherpa's motion to dismiss, he does not assert that the claim is a remedy for any other cause of action. ECF No. 89 at 8. Accordingly, application of California law to the unjust enrichment claim would result in dismissal.

Because applying California law would lead to dismissal of the claim, while the application of Connecticut law would not, there is an actual conflict of law. And because the parties have not briefed the choice of law issue, the Court declines to conduct that analysis without giving the parties the opportunity to do so.[4] Accordingly, the Court denies Sherpa's motion to dismiss the unjust enrichment claim, as she has not met her burden to show that Blassberg's complaint fails to state a claim under Rule 12(b)(6). *See Gonzalez v. Option One Mortg. Corp.*, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) ("the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6).").

## V.    Conclusion

For the reasons set forth above, the Netflix Motion and A&C's Motion to Dismiss (ECF Nos. 80 and 83) are GRANTED. Sherpa's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Accordingly, all counts against Netflix, SK, A&C, MakeMake, and OBB are dismissed with prejudice. The three copyright claims and the breach of the covenant of good faith and fair dealing claim against Sherpa are dismissed with prejudice.

The only remaining claims in this case are the breach of contract and unjust enrichment claims against Sherpa. Accordingly, the Court lifts the stay on discovery. Discovery on the breach of contract and unjust enrichment claims against Sherpa shall proceed. The Court hereby sets the following scheduling order:

- Fact Discovery is due by 9/21/2026.

---

[4] The Court will permit briefing on the choice of law analysis for the unjust enrichment claim at the summary judgment stage.

- Expert reports on issues for which the party bears the burden are due 9/30/2026 and the deposition deadline is 10/30/2026.
- Expert reports on issues for which the party does not bear the burden are due on 10/16/2026 and the deposition deadline is 11/13/2026.
- A Damages Analysis is to be provided by 8/31/2026.
- Dispositive Motions due by 11/2/2026.
- Joint trial memo due by 1/4/2027 or 45 days following a ruling on any dispositive motions.

IT IS SO ORDERED.


                                                    _____/s/_____

                                                    Michael P. Shea, U.S.D.J.



Dated:  Hartford, Connecticut

        June 23, 2026


33